**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Anacapa Technology, Inc., a Nevada corporation, as assignee of Anacapa Nevada, Inc., a Nevada corporation**

**Plaintiff,**

**v.**

**ADC Telecommunications, Inc., a Minnesota corporation,**

**Defendant.**

**Civil No. 01-729 (DSD/SRN)**

**ORDER**

---

Norman J. Baer, Esq. and Karlyn Vergoe Boraas, Esq., on behalf of Plaintiff.

Randall E. Kahnke, Esq. and Kerry L. Bundy, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on February 5, 2002, on Plaintiff's Motion to Compel (Doc. No. 43), and Defendant's Motion to Compel and for Protective Order (Doc. No. 46). The Court ruled from the bench on both motions, and this Order serves to memorialize those rulings.

## I. FACTUAL BACKGROUND

### A. The License Agreement.

On January 16, 1998, Anacapa and ADC entered into a license agreement (License Agreement), which had an effective date of June 13, 1996. (Affidavit of Randall Kahnke (Kahnke Aff.), Ex. 1.) Under the License Agreement, Anacapa granted ADC royalty-bearing

APR 04 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

licenses, with a right to sublicense, to certain heat dissipation technology known as Background Thermal Transfer Technology (BTTT) and Generated Thermal Transfer Technology (GTTT). Id. This technology was used in two products manufactured by ADC's sublicensee, and sold by ADC. (Kahnke Aff. at ¶ 2.) To date, ADC has paid Anacapa over $4.5 million in royalty fees for the licenses. Id. To date, ADC has had related revenues in excess of $60 million. (Supplemental Affidavit of Norman Baer (Baer Supp. Aff.), Ex. U.)

Section 2.3 of the License Agreement provides for termination as follows:

> This Agreement may be terminated by either Party in the event of a material breach by the other Party of the terms of this Agreement (including the inability of a Party to grant the licenses granted in accordance with Article 4 of this Agreement), provided that the terminating Party first gives the defaulting Party written notice of termination, specifying the grounds therefor, and the defaulting Party has had thirty (30) days after such notice is given to cure the breach. If not so cured, the Parties agree to submit the question of whether a material breach occurred to binding arbitration. If the arbitrator determines that ANACAPA committed a material breach, the royalties due under Article 5 shall be reduced by 2% per Calendar Quarter. In the event that the royalties are reduced to zero percent (0%), ADC may terminate the Agreement and the licenses granted to ADC under Article 4 shall survive. In the event that ANACAPA cures the breach before termination of the Agreement, the royalties are restored to their original rate. If the arbitrator determines that ADC committed a material breach, ANACAPA may terminate the Agreement if ADC does not cure within thirty (30) days of such determination. Termination of this Agreement pursuant to this Paragraph 2.3 before December 31, 2001 shall automatically result in termination of the licenses granted under Article 4 to the defaulting Party. Any termination pursuant to this Article 2 on or after December 31, 2001 shall not affect the license granted under Article 4. Waiver by a Party of a default by the other Party shall not deprive the first Party of the right to terminate this Agreement due to any subsequent default of the other Party.

Section 5.2 of the License Agreement provides that ADC has royalty obligations to

Anacapa beginning at the effective date of the License Agreement and expiring on December 31, 2001. At that point "the license becomes paid up and no further royalties are due and payable." Section 5.3 provides that ADC must pay royalties on certain later-developed technology for an additional six months, but at that point those licenses also become fully paid up. Hence, ADC will have made all of its royalty payments, and will retain the license for the future.

**B. Arbitration.**

On April 21, 2001, Anacapa served an arbitration Statement of Claim against ADC, alleging a material breach of the License Agreement. (Kahnke Aff., Ex. 2.) Anacapa claimed that ADC had not adequately protected Anacapa's confidential information, including trade secrets. Id. at ¶ 11. Anacapa's claim stated that in September 2000, ADC's sublicensee Special Product Company (SPC) obtained a patent for repeater housing based on Anacapa's BTTT technology. Id. at ¶ 12. In addition, the claim stated that SPC had displayed two variations of the repeater housing at a trade show in November 2000. Id. at ¶ 13. Anacapa's claim concluded that ADC's breach of its duties to protect this confidential information constituted an incurable material breach of the License Agreement. Id. ¶ 16.

On October 22-26 and 31, 2001, the arbitration panel conducted a hearing. On November 5, 2001, the panel issued its Award, finding that ADC had materially breached the License Agreement. The Award stated:

> ADC materially breached the Agreement. The material breach was the failure of ADC to require Special Products [sic] Company ("SPC") to treat as confidential the Anacapa Confidential Information as defined in ¶ 10.2(a) of the Agreement, and the failure of ADC to maintain reasonably adequate procedures to prevent loss or unauthorized disclosure of the Confidential Information, all in violation of ¶¶ 10.2(b) and (c) of the

Agreement.

(Kahnke Aff., Ex. 4.)

### C. Post-Arbitration Communications.

On November 5, 2001, Anacapa sent ADC a copy of the arbitration Award, and a letter stating "if ADC does not cure its breach on or before December 5, 2001, Anacapa shall, as of that same date, terminate the Agreement." (Kahnke Aff., Ex. 5.) Anacapa also stated in its letter, "please contact the undersigned to discuss any 'cure' issues." Id. In a later telephone conversation between counsel, Anacapa stated that, based on its initial review of the award, it believed curing the breach would be impossible. (Kahnke Aff., Ex. 6.)

Prior to the arbitration hearing, ADC had deposed representatives of SPC based on its suspicion that SPC was breaching its sublicense agreement with ADC. From at least one deposition, ADC believed it learned that SPC was selling the Generation 2 repeater housing (GEN 2), which incorporated the sublicensed technology, for its own benefit and without ADC's permission. (Kahnke Aff., Ex. 32.) On October 10, 2001, ADC sent SPC a Notice of Breach letter, directing SPC to cease misusing the technology. (Kahnke Aff., Ex. 7.) On November 6, 2001, SPC informed ADC that the GEN 2 product was comprised of design concepts developed prior to entering into any agreement with ADC, and, therefore, there was no breach of the sublicense agreement. (Kahnke Aff., Ex. 8.)

On November 9, 2001, ADC filed a breach of contract action against SPC in Federal District Court. (Kahnke Aff., Ex. 10.) On November 14, 2001, ADC filed papers in support of a preliminary injunction, requiring SPC to comply with the use restrictions contained in the sublicense agreement. (Kahnke. Aff., Ex. 11.) ADC states that it subsequently advised Anacapa

of the lawsuit. On November 29, 2001, after initially contesting the breach of contract claim, SPC consented to entry of the injunction. The injunction states,

> the SPC Series 7000 Generation 2 repeater housing ("GEN 2") incorporates Thermal Transfer Technology as defined in § 1.19 of the ADC-SPC Collaboration Agreement ("the Agreement"); that the GEN 2 repeater housing incorporates Generated Rights as defined in § 1.11 of the Agreement; and that the Court shall immediately enter an injunction . . . against Defendant Special Product Company ("SPC"), ordering SPC to comply with the use restrictions contained in §§ 5.1 and 5.4 of the Agreement with respect to the GEN 2 repeater housing.

(Kahnke Aff., Ex. 12.) ADC and SPC also entered into a settlement agreement concerning royalties on GEN 2 sales, and joint ownership of certain patents and patent applications. (Kahnke Aff., Ex. 13.)

On December 4, 2001, ADC provided Anacapa with a three and one half page single-spaced letter detailing the efforts it had undertaken, and stating that it had successfully cured the breach. (Kahnke Aff., Ex. 14.) ADC's letter described the injunction that had been issued against SPC. The letter also detailed ADC's auditing of SPC's products, and explained that SPC had not disclosed any confidential information made available to it by ADC or Anacapa. In addition, ADC provided Anacapa with a royalty check for SPC's sales of the GEN 2. Id.

On December 5, 2001, Anacapa requested the underlying documents supporting the cure letter. In response, ADC supplied copies of the settlement agreement, and an addendum to the SPC-ADC collaboration agreement. (Kahnke Aff., Ex. 15.) Anacapa responded that it would not be able to determine if ADC's cure of the breach was sufficient until its principal, Eric Laetsch, had access to the documents. (Kahnke Aff., Ex. 16.) Also on December 5, 2001, Anacapa served a 30(b)(6) deposition notice on ADC. (Kahnke Aff., Ex. 17.) The notice

required ADC to produce a representative on December 19, 2001, to testify concerning: (1) ADC's purported cure of its breach of the ADC-Anacapa Agreement, which was determined by the arbitration Award of November 5, 2001, including all matters addressed in the December 4, 2001 correspondence from Michael Ouyang to Erich Laetsch, et al.; and (2) the ADC-SPC litigation commenced on or about November 9, 2001, and the negotiations and/or agreements that resulted in the injunction and/or dismissal of that litigation. Id.

On December 7, 2001, Anacapa's counsel sent ADC a letter stating Anacapa had concluded ADC had not cured its material breaches of the License Agreement. (Kahnke Aff., Ex. 18.) The letter further stated, "[a]fter the December 19 deposition, Anacapa will be able to make a more complete assessment. At that time, I will communicate with you again and spell out the bases for Anacapa's conclusion." Id.

On December 11, 2001, ADC served notice of a 30(b)(6) deposition. (Kahnke Aff., Ex. 19.) The notice required Anacapa to produce a representative on December 17, 2001, to testify concerning: (1) the bases for the assertion in Anacapa's December 7, 2001 letter that ADC had not cured its material breaches; (2) the bases for the assertion in Anacapa's December 7, 2001 letter that the attempted cure was not satisfactory; (3) the purported deficiencies in ADC's cure of the material breach; and (4) Anacapa's communications with any person relating to ADC's attempt to cure and cure, and/or the ADC-SPC litigation commenced on November 9, 2001 and the settlement agreement and injunction entered in that litigation. Id.

On December 11, 2001, ADC wrote to Anacapa requesting information underlying its conclusion that ADC had failed to cure the breach. (Kahnke Aff., Ex. 20.) On December 13, 2001, ADC wrote to Anacapa informing it that it would allow Mr. Laetsch to review the ADC-

SPC settlement agreement and addendum number 002 solely for analysis of the cure. (Kahnke Aff., Ex. 21.)

Evidently neither party's 30(b)(6) representative was available for deposition on the dates noticed. On December 13, 2001, ADC wrote to Anacapa stating it had received a deposition notice the previous day, rescheduling the 30(b)(6) deposition for January 2, 2002. (Kahnke Aff., Ex. 22.) ADC stated that January 2, 2002 would not work, and that ADC wished to depose Anacapa's representative first, in order to allow it to prepare for the deposition of its own representative. (Kahnke Aff., Ex. 22.) On December 26, 2001, Anacapa wrote to ADC offering to reschedule the 30(b)(6) deposition to January 7, 2002, and stating that January 14 or 15, 2002 would be the earliest date it could make its own representative available for deposition. (Kahnke Aff., Ex. 24.)

On January 4, 2002, ADC wrote to Anacapa stating it would produce a representative for deposition, but it believed it would be appropriate for Anacapa to produce its representative for deposition first. (Kahnke Aff., Ex. 25.) ADC explained that because it had already produced substantial information to Anacapa explaining the cure, Anacapa should produce its witness first, in order to respond to this information. Id. In response to Anacapa's statement that it should be able to depose ADC first, ADC stated that it believed under the facts of the case and applicable law, "the mere fact that Anacapa served its deposition first should not control." Id. ADC stated that it was prepared to bring an expedited motion seeking a court order allowing it to depose Anacapa first. Id. ADC also stated that Anacapa had confirmed it had not made a final determination of whether ADC had cured the material breach. Id. Because Anacapa had not terminated the License Agreement by December 31, 2001, ADC stated, certain topics identified

in Anacapa's 30(b)(6) deposition notice were no longer relevant. Id.

In response, on January 4, 2002, Anacapa wrote to ADC stating that it had terminated the License Agreement on December 5, 2001. (Kahnke Aff., Ex. 30.) Anacapa stated that its December 5, 2001 Complaint for patent infringement indicated it did not believe ADC still had a license. Id. Further, Anacapa explained that it had notified ADC on December 7, 2001, of its position with respect to ADC's attempted cure. Id. Anacapa also stated that it would have been able to reach a final conclusion with respect to the cure before December 31, if ADC had complied with its discovery obligations. Id.

**D. ENCASER Discovery.**

In its Answer, ADC brought a counterclaim seeking a declaration that the ENCASER and ENCASER 819 enclosures fall outside the scope of the License Agreement. On July 27, 2001, the parties stipulated, and the Court ordered that portions of the litigation would proceed on a parallel track to the arbitration, and that the parties would engage in expedited discovery with respect to ADC's declaratory judgment claim. The parties also agreed that all discovery produced in the arbitration would be deemed produced in the litigation and vice versa.

On June 18, 2001, Anacapa served the following interrogatory on ADC:

> **INTERROGATORY NO. 10:** Describe in detail the factual basis for ADC's allegation that the ENCASER and ENCASER 819 products fall outside the Anacapa-ADC License Agreement, as alleged in paragraph 110 of ADC's Amended Answer and Counterclaim.

On August 21, 2001, ADC supplied the following response:

> ADC objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work-product doctrine. ADC also objects to this interrogatory to the

> extent it purports to require a description "in detail" of the factual basis for ADC's allegation. Subject to the forgoing objections, and without waiving those objections, ADC provides the following response: the EnCaser and EnCaser 819 were the subject of a project that had as one of it (sic) goals to design a repeater enclosure that did not include Background Thermal Transfer Technology or Generated Thermal Transfer Technology, which are defined in section 1.4 and 1.13, respectively, of the Agreement. Material participants in that project have previously been identified, and included Michelle Shannon, Gary Gustine, and Chuck Ham. Anacapa has noticed Ms. Shannon's deposition. See also documents produced in response to Anacapa's document requests, which production is continuing, and deposition testimony of Erich Laetsch.
>
> Moreover, ADC has been advised by counsel that the EnCaser and EnCaser 819 contain no Background Thermal Transfer Technology, Generated Thermal Transfer Technology, or Anacapa Confidential Information.

On September 5, 2001 and October 5, 2001, Anacapa deposed Michelle Shannon and Gary Gustine, questioning both of them about the ENCASER and ENCASER 819 enclosures. (2d Kahnke Aff., Ex. C.)

Subsequently, the parties served the following discovery requests and responses:

> **INTERROGATORY NO. 13:** With respect to ADC's Answer to Interrogatory No. 10 . . . provide the following information regarding the fact that ADC has been advised by counsel that the EnCaser and EnCaser 819 contain no Background Thermal Transfer Technology, Generated Thermal Transfer Technology or Anacapa confidential information:
>
> (a) The name and address of counsel who advised ADC;
> (b) The date that counsel provided the opinion to ADC;
> (c) The date that ADC requested a legal opinion from counsel;
> (d) List of recipients of the legal opinion;
> (e) List of documents and/or information counsel relied upon in reaching a legal opinion; and
> (f) List of individuals that counsel talked to prior to reaching the legal opinion.

**ANSWER:**
See objections and answer to Interrogatory No. 12. Subject to those objections, ADC provides the following response:

(a) William K. Weimer, Faegre & Benson, 2200 Wells Fargo Center, Minneapolis, Minnesota 55402;
(b) On or about May 4, 2001;
(c) On or about March 29, 2001;
(d) Michael Ouyang, ADC Telecommunications, Inc.;
(e) Numerous documents and material produced in connection with this action, including, but not limited to: Prototypes of the EnCaser and EnCaser 819 enclosures; Radiator and Radiator II enclosures; prototype provided to ADC by Erich Laetsch, which was a variation of the Radiator enclosure, but with a "breech" design; SPC 7000 enclosure; 819-style enclosure; the Anacapa-ADC Agreement; memo from Erich Laetsch to Joseph Charboneau dated June 18, 1996; information provided orally by Charles Ham regarding information provided to ADC by Anacapa; information provided orally by Charles Ham and Gary Gustine regarding the above-noted enclosures, deposition testimony of Erich Laetsch; and
(f) Charles Han and Gary Gustine, both of ADC Telecommunications, Inc.

**REQUEST NO. 12:** Any and all legal opinions related to EnCaser and EnCaser 819, as referenced in ADC's Answer to Interrogatory No. 10 . . .

**RESPONSE:**

ADC objects to this request to the extent it seeks information subject to the attorney-client privilege and/or the work product doctrine. See also ADC's answer to Interrogatory No. 12. Subject to, and without waiver of, the forgoing objections, ADC provides the following response: All non-privileged responsive documents will be provided at a mutually agreeable time and place.

**REQUEST NO. 13:** Any and all supporting documentation relied upon in reaching the legal opinion regarding EnCaser and EnCaser 819, as referenced in ADC's Answer to Interrogatory No. 10 . . .

> **RESPONSE:**
>
> ADC objects to this request to the extent it seeks information subject to the attorney-client privilege and/or the work product doctrine. See also ADC's answer to Interrogatory No. 12. Subject to, and without waiver of, the forgoing objections, ADC provides the following response: All non-privileged responsive documents will be provided at a mutually agreeable time and place.
>
> **REQUEST NO 14:** Any and all drafts of all legal opinions related to EnCaser and EnCaser 819, as referenced in ADC's Answer to Interrogatory No. 10 . . .
>
> **RESPONSE:**
>
> ADC objects to this request to the extent it seeks information subject to the attorney-client privilege and/or the work product doctrine. See also ADC's answer to Interrogatory No. 12. Subject to, and without waiver of, the forgoing objections, ADC provides the following response: All non-privileged responsive documents will be provided at a mutually agreeable time and place.

(Baer Aff., Exs. L & M.)

On December 5, 2001, Anacapa amended its complaint to add declaratory judgment and patent infringement claims relating to the ENCASER and ENCASER 819 enclosures. On December 20, 2001, Anacapa served an amended notice of 30(b)(6) depositions on ADC. (Baer Aff., Ex. H.) This notice required that ADC designate a representative to also testify regarding "the facts supporting ADC's claim for declaratory judgment regarding the applicability of the ADC-Anacapa Agreement to EnCaser and/or EnCaser 819." Id.

## II DISCUSSION

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of any matter "relevant to the subject matter involved in the pending action" if it would either be admissible as evidence at trial or if it "appears reasonably calculated to lead to the discovery of admissible evidence." The standard of relevance in the context of discovery is broader than in the context

of admissibility. Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992); Fed. R. Civ. P. 26(b) (inadmissibility is not grounds for objection to discovery). A threshold showing of relevance must be made before discovery is allowed, Onwuka v. Federal Express Corp., 178 F.R.D. 508, 516 (D. Minn. 1997), but the Court has broad discretion in fashioning an appropriate remedy to resolve disagreements over the production of the requested information. Cook v. Kartridg Pak Co., 840 F.2d 602, 604 (8th Cir. 1988). There is no black letter rule on discoverability, rather "courts have undertaken a fact specific determination of the extent of the similarities or dissimilarities, and have inquired about the basis for the discovery request." Hofer, 981 F.2d at 380-81.

> [T]he court in the district where the deposition is to be taken may make any order which justice requires to protect a party of person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (2) that the disclosure or discovery my be had only on specified terms and conditions, including a designation of time or place.

Fed. R. Civ. P. 26(c)(2).

**A. Plaintiff's Motion to Compel.**

The first section of Plaintiff's motion to compel concerns the order in which the 30(b)(6) depositions are to be taken. That issue is also the subject of Defendant's motion to compel, and will be addressed in that section of this Order.

With respect to the ENCASER and ENCASER 819 enclosures, Plaintiff asserts that the Court should order Defendant to produce all documents responsive to Interrogatory No. 13, Document Request Nos. 12-14, and a witness to testify about Defendant's claim for declaratory judgment. Plaintiff states that although Defendant disclosed that William Weimer of Faegre and

Benson was the lawyer on whose opinion it relied, Defendant has still refused to produce the legal opinions, and drafts of those opinions, or any supporting documents.

Plaintiff argues that the attorney-client privilege can not apply to Weimer's opinion, because Defendant has relied on that opinion as part of the factual basis for its declaratory judgment claim. Plaintiff states that case law demonstrates "it is impermissible to assert a lawyer's opinion as support for one's claim and refuse to disclose that opinion and all communications and documents related to it."

Plaintiff also states that the work-product doctrine should not prevent disclosure in this case. Plaintiff explains that it has substantial need of the materials, because the opinion is part of the factual basis for Defendant's claim. Further, Plaintiff has no access to this opinion other than by requesting it directly from Defendant. Plaintiff contends that the waiver "was confirmed by ADC's failure to mention Mr. Weimer's opinion in its privilege log." Therefore, Defendant is obligated to disclose the information sought.

Defendant responds that it has not waived its right to assert the attorney-client privilege and work-product doctrine. Defendant explains that in its response to Interrogatory No. 10, it made clear that Weimer's opinion was not an essential part of the factual basis for its declaratory judgment claims. Specifically, Defendant's answer first identified three employees, documents, and the deposition testimony of Erich Laetsch as factual support for its claim. Weimer's opinion was merely a minor addition.

Defendant argues that it has not waived its right to assert the attorney-client privilege or work-product doctrine. Defendant explains that it did not rely on Mr. Weimer's advice during the arbitration hearing to prove anything about the ENCASER and ENCASER 819 enclosures.

Defendant also states it has not relied on the advice as an element of a claim or defense. To date, it has relied on information gained through ADC employees, documents produced in connection with the arbitration and this litigation, and information learned through deposing Erich Laetsch. "Accordingly, ADC is not currently attempting to utilize an attorney client communication to prove its claim." Because it has not yet determined whether it will rely on Weimer's advice as an element of a claim or defense, Defendant concludes that Plaintiff's motion to compel is premature and should be denied. Alternatively, if the Court determines it has interjected Weimer's advice into this dispute, Defendant requests that it allow Defendant to chose either to disclose that advice, or alternatively, retain the privilege and be precluded from relying on the opinion later.

The Court finds that Plaintiff's motion is not premature. There is clearly a difference between mentioning the advice of counsel in a discovery response, and relying on that advice as an element of a defense. But discovery is now nearly complete, and Defendant can no longer appropriately withhold Weimer's opinion, and the information connected to it, on the basis that it has not decided whether to rely on the opinion as a basis of its defense. The Court advised Defendant at the hearing on this matter that it had 30 days to decide whether it would rely on Weimer's opinion as part of its defense or not. If it chose to rely on the opinion, then any claim to attorney-client privilege would be waived, and Defendant would have to respond completely to Plaintiff's discovery request. See Sedco Int;l, S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982) (attorney-client privilege waived when client asserts reliance on an attorney's advice as an element of a claim or defense) citing Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975).

**B. Defendant's Motion to Compel and for Protective Order.**

Defendant asserts that the Court should order Plaintiff to produce a 30(b)(6) witness to identify its bases for concluding that Defendant's cure is not satisfactory. Further, Plaintiff should do so before conducting its 30(b)(6) deposition of Defendant. Defendant states that it will suffer undue prejudice if forced to produce a witness without first knowing the deficiencies Plaintiff is claiming. Defendant cites Xerox Corp. v. IBM, 64 F.R.D. 367, 371-72 (S.D. N.Y. 1974), for the proposition that a patent infringement and trade secret plaintiff must specifically identify all trade secrets and confidential information alleged to have been misappropriated, before a witness can be required to answer deposition questions regarding those issues.

Defendant states that Plaintiff has received numerous documents setting forth Defendant's understanding of the breach and its cure. Plaintiff received the majority of the ADC-SPC pleadings, including Defendant's memorandum in support of the preliminary injunction. In addition, Plaintiff has received Defendant's letter explaining the cure, and the underlying documents. If Plaintiff is not required now to identify the deficiencies in the breach, Defendant argues, Defendant will be left guessing what Plaintiff believed the breach was, and why the cure was insufficient. Moreover, Defendant contends that if it is deposed first, Plaintiff will likely manufacture new alleged deficiencies in the cure. Hence, Defendant will be unable to adequately prepare a defense.

Defendant asserts that Plaintiff has altered its position throughout the arbitration process. Defendant states that Plaintiff listed two SPC products in its Statement of Claim, but then during arbitration shifted its claim to a different product, once it became clear the first two were not subject to the License Agreement. Defendant argues that Plaintiff is manipulating the arbitration panel's omission of an underlying basis for its conclusion that there was a breach, and that it

continues to refuse to inform Defendant what it believes is the breach.

Defendant explains that Plaintiff will not be prejudiced if it is deposed first. In order for Plaintiff to currently maintain that the cure is unsatisfactory, according to Defendant, it must have determined what it believes to be the continuing breach. Therefore, Plaintiff should now be prepared to be deposed on this subject. In the alternative, Defendant requests that the Court order simultaneous depositions.

Plaintiff responds that Defendant should be deposed first. It states that once the arbitration panel determined there had been a breach, the burden shifted to Defendant to prove it had been cured. Further, Plaintiff states that in its November 5, 2001 termination letter, it invited Defendant's counsel to discuss any cure issues, but that Defendant never took that opportunity. Plaintiff states that it revealed its understanding of the breach through its February 2001 Notice of Breach, April 2001 Statement of Claim, and the voluminous testimony prior to and during the arbitration hearing. Moreover, the evidence was clear enough to allow the arbitration panel to conclude there was a breach.

Plaintiff argues that it would be fundamentally unfair to require it to defend against Defendant's claim of cure, without permitting it sufficient discovery to fully understand that claim. Defendant's failure to produce a witness, according to Plaintiff, has prevented it from gaining such information. In contrast, Defendant's claim to have cured the breach demonstrates that Defendant must already have a clear understanding of what the breach is. Therefore, it is reasonable to expect Defendant to be deposed first.

With respect to allegations of dishonesty, Plaintiff states that Defendant is the party who has been less than honest. In its March 23, 2001 letter, Defendant denied any breach of the

License Agreement. Plaintiff emphasizes that prior to that letter: (1) as early as November 1998, Defendant's senior product manager had acknowledged there had been a hole in the ADC-SPC contract; (2) in June 1999, the same senior product manager believed an SPC product might violate Plaintiff's patent; (3) on August 19, 1999, Defendant's Chief Intellectual Property Counsel wrote to Plaintiff informing it that the ADC-SPC relationship was not violating the License Agreement, but did so with no understanding of what SPC was doing with their non-ADC products; and (4) additional senior managers for Defendant had informed Defendant's counsel as early as April 2000 that they believed SPC was improperly using Plaintiff's technology.

Plaintiff concedes that it has a substantial incentive to prove Defendant failed to cure on or before December 5, 2001. Plaintiff asserts, however, that Defendant has a stronger incentive to prove it did cure, given that over the term of the agreement it has had related revenues in excess of $60 million. Plaintiff concludes that the proper way to reduce the opportunity for gamesmanship will be to require Defendant to provide discovery first, because it is the party advancing the claim of cure.

The Court denies Defendant's motion. The Court acknowledges both parties' concerns over maintaining a level playing field in this litigation, and the possibility that each deposition will lead to the parties perpetually modifying their positions. Therefore, prior to either of the 30(b)(6) depositions, Plaintiff was instructed to respond to Defendant with a detailed explanation of what breaches exist, and why, based on the information it had prior to December 31, 2001, Plaintiff concluded that Defendant had not satisfactorily cured those breaches. This explanation was either to be in the form of a letter, or as a response to Plaintiff's interrogatories. Thus, each

party would have a clear record of the opposing party's position prior to the depositions. Once Plaintiff completed its explanation, it would be permitted to depose Defendant first.

**THEREFORE, IT IS HEREBY ORDERED that:**

(1) Plaintiff's Motion to Compel (Doc. No. 43) is **GRANTED**;

(2) Defendant's Motion to Compel and for Protective Order (Doc. No. 46) is **DENIED**

Dated: April 4, 2002

SUSAN RICHARD NELSON
United States Magistrate Judge