UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-729(DSD/SRN)

Anacapa Technology, Inc, a Nevada corporation, as assignee of Anacapa Nevada, Inc., a Nevada corporation,

Plaintiff,

v.

**ORDER**

ADC Telecommunications, Inc., a Minnesota corporation,

Defendant.

Norman J. Baer, Esq., Karlyn V. Boraas, Esq. and Anthony, Ostlund & Baer, 90 South Seventh Street, Suite 3600, Minneapolis, MN 55402, counsel for plaintiff.

J. Derek Vandenburgh, Esq., Anthony R. Zeuli, Esq., Ricky L. Franzen, Esq. and Merchant & Gould, 80 South Eighth Street, Suite 3200, Minneapolis, MN 55402 and Randall E. Kahnke, Esq., Kerry L. Bundy, Esq. and Faegre & Benson, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon the motion for partial summary judgment of defendant ADC Telecommunications, Inc ("ADC"). Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.

FILED 1-22-03
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ____________
Deputy Clerk's Initials ______

## BACKGROUND

This case involves repeater housing technology, which is used in the telecommunication industry. Repeaters are placed within phone line networks to boost and transmit telecommunication signals. (Kahnke Aff. Ex. 14 at 3; Ex. 30 at 1.) Because outside elements such as weather and rodents can affect repeaters, they are inserted into and protected by repeater housings. (Id.)

In 1996, ADC sought technology for repeater housings that could dissipate excess heat. Anacapa designed such a technology, called Thermal Transfer Technology ("TTT"). On June 13, 1996, ADC and Anacapa reached an agreement ("the agreement") where Anacapa granted ADC licenses to two subsets of TTT - Background Thermal Transfer Technology ("BTTT") and Generated Thermal Transfer Technology ("TTT"). In exchange, ADC agreed to pay Anacapa royalties on all repeater housings incorporating BTTT, sold before December 31, 2001, and all repeater housings incorporating GTTT sold through June 30, 2002. ADC also agreed to protect Anacapa's confidential information.[1]

---

[1]Article 10, the contractual provision which is the subject of this dispute, defines Anacapa's confidential information as follows:

> 10.2 ANACAPA CONFIDENTIAL INFORMATION
>
> a. "ANACAPA Confidential Information" shall mean all information disclosed by ANACAPA to ADC (whether orally, in writing, or in other tangible form) which relates to the manufacture, use, sale or marketing of ANACAPA's products or components of such

(continued...)

ADC "out-sourced" the manufacture of Anacapa's TTT to Special Product Company ("SPC"), a manufacturer and seller of repeater housings. In July 1998, ADC and SPC executed a collaboration agreement and manufacturing agreement, which contained use

---

[1](...continued)

> products, including, but not limited to: information relating to matters which are the subject of this Agreement; knowledge or information developed by ADC as a direct result of work performed in connection with this Agreement, other than information that is the sole property of ADC under this Agreement, and all other information regarding ANACAPA products, processes, equipment, machinery, apparatus, business operations, technical information, drawings, specifications, material, and the like; except that the "Confidential Information" shall not include information which:
> (1) Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by ADC, recognizing that the act of copyrighting in itself does not cause the copyrighted material to be in the public domain;
> (2) Is lawfully in the possession of ADC prior to disclosure by ANACAPA as shown by written records; or
> (3) Is lawfully disclosed to ADC by a third party which did not acquire the same under an obligation of confidentiality from or through ANACAPA; or
> (4) Is independently developed by or on behalf of ADC without reference to Confidential Information received hereunder.
>
> Notwithstanding the above exceptions, any and all Background Thermal Transfer Technology shall also be included within the definition of ANACAPA Confidential Information.

(Kahnke Aff. Ex. 1 at 20-21.)

restrictions with respect to rights licensed or sublicensed by ADC to SPC, defined as Thermal Transfer Technology and Generated Rights ("GR"). (Kahnke Aff. Exs. 17 and 19.) Through those agreements, ADC sublicensed certain TTT to SPC.

Anacapa, however, identified problems with SPC's use of Anacapa's confidential information. For instance, SPC was making and selling repeater housings referred to by SPC as Gen 2 or Series 7000 Generation 2 repeater housings ("Gen 2") that incorporated TTT and GR in violation of the use restrictions. (Kahnke Aff. Ex. 25.) Anacapa alleged that ADC materially breached the agreement by not adequately protecting Anacapa's confidential information. Anacapa and ADC engaged in arbitration and the arbitrators found:

> ADC materially breached the Agreement. The material breach was the failure of ADC to require Special Products Company ("SPC") to treat as confidential the Anacapa Confidential Information as defined in ¶ 10.2(a) of the Agreement, and the failure of ADC to maintain reasonably adequate procedures to prevent loss or unauthorized disclosure of Confidential Information, all in violation of ¶¶ 10.2(b) and (c) of the Agreement.

(Kahnke Aff. Ex. 2.)

After the arbitrators issued their findings, Anacapa sent ADC notice that if the breach was not cured within a 30-day cure window, the agreement would terminate. Anacapa claims that ADC failed to cure the breach. ACA now moves for partial summary judgment, asking the court to find it cured the material breach.

Because the undisputed facts illustrate that ADC cured the material breach, the court grants ADC's motion for partial summary judgment.

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth

specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

## II. Cure

The parties dispute the definition of cure and whether ADC cured its material breach. The court considers each issue in turn.

### A. Definition of Cure

A threshold question is what it means to "cure."[2] While case law on the question is sparse, it is clear that to cure a material breach means to engage in subsequent conduct that substantially performs or performs without a material failure. See Restatement (Second) Contracts § 237 cmt. b (1981)("Even if the failure is material, it may still be possible to cure it by subsequent

---

[2] The construction and effect of a contract is a question of law, unless a contract's terms are ambiguous. Jacobs v. Pickands Mather & Co., 933 F.2d 652, 657 (8th Cir. 1991); Servais v. T.J. Mgmt. of Minneapolis, Inc., 973 F. Supp. 885, 892 (D. Minn. 1997). The language of a contract must be given its plain and ordinary meaning. Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998). Here, the court finds no ambiguity and concludes that the plain and ordinary meaning of the term "cure" applies. Therefore, the meaning of the term "cure" is a question for the court. See Ragsdale v. Tom-Boy Inc., 317 S.W.2d 679, 688 (Mo. Ct. App. 1958)("the meaning of plain and ordinary words is a matter of construction by the court...."); see also Hubred v. Control Data Corp., 442 N.W.2d 308, 311 (Minn. 1989)(affirming trial court's determination of plain and ordinary meaning of contract terms).

performance without material failure."); 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.17 (explaining that a breach can be cured "by correcting the deficiency in performance.")

Cure does not require perfect performance. Only if the breach is not cured to the level of substantial performance may the injured party terminate the contract. As explained in Corbin on Contracts:

> [Cure] gives the contractor or seller another chance to perform substantially.... Cure gives a contractor a second chance to perform according to the contract. If, however, a defective performance is not cured to the level of substantial performance, the injured party is discharged.

8 Catherine M.A. Mc Cauliff, Corbin on Contracts ¶ 36.7 (citations omitted). Put another way:

> When the breaching party does attempt to cure, the injured party again must analyze that party's performance with respect to the material breach standard. A cure that completely remedies the breach does not pose a problem; but a less than complete cure raises the issue of whether there is still a material breach or whether the breaching party has now substantially performed, thus making the breach nonmaterial. If the breach is upgraded to nonmaterial, the constructive condition is satisfied by cure just as it would have been if substantial performance had been rendered initially. Therefore, the injured party only has a cause of action for partial breach and is not allowed to terminate the contract.

William H. Lawrence, *Cure After Breach of Contract Under the Restatement (Second) of Contracts: An Analytical Comparison with the Uniform Commercial Code*, 70 Minn. Law Rev. 713, 747 (1986).

Anacapa nevertheless argues that to cure a material breach under Minnesota law, one must stop the offending conduct and repair the harm done by the breach. Anacapa cites Aamco Indus., Inc. v. De Wolf, 250 N.W.2d 835 (Minn. 1977) to support its argument. Aamco, however, does not stand for that proposition. In that case, an operator of an Aamco transmission service facility franchise brought an action against a franchisee for declaratory and injunctive relief after terminating the franchise subsequent to discovering consumer fraud. Id. The franchisee claimed that the Aamco's failure to give 24-hour notice to correct the alleged breaches of the franchise agreement was in violation of the statutory requirements and precluded termination of the franchise. Id. at 100. The franchisee further argued that the evidence did not support termination. Id. After an examination of the records, the Minnesota Supreme Court agreed with the trial court that a 24-hour notice would have been futile in this case and that the evidence sustained the trial court's determination to terminate the franchise. Id. at 103. The court did not hold, or even discuss, that cure requires a breaching party to stop the offending conduct and repair the harm done. Instead, cure requires substantial performance or performance without a material failure.

**B. ADC Cured the Material Breach**

In this case, the arbitrators found that ADC materially breached its agreement with Anacapa (1) by failing to require SPC

to treat as confidential Anacapa's confidential information as defined in ¶ 10.2(a) of the agreement and (2) by failing to maintain reasonably adequate procedures to prevent loss or unauthorized disclosure of confidential information. The key question therefore is whether ADC cured its material breach through substantial performance or performance without a material failure.[3]

While that question is usually one of fact, see Corbin on Contracts § 36.5, the court may determine whether a party has cured its material breach in cases such as this one where there are no material facts in dispute and only the legal conclusions to be drawn from the facts remain in doubt. See Gibson v. City of Cranstron, 37 F.3d 731, 736 (1st Cir. 1994)("[I]f the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law."); see

---

[3]Anacapa argues that ADC could not cure because its breach was incurable. Anacapa is estopped from asserting that argument because Anacapa induced ADC to cure its breach when Anacapa sent ADC notice that if the breach was not cured within the 30-day cure window, the agreement would terminate. (See Baer Aff. Ex. 28.) Anacapa cannot now argue that the breach was incurable. See, e.g., Drake v. Reile's Transfer & Delivery, Inc., 613 N.W.2d 428 (Minn. Ct. App. 2000)("Equitable estoppel prevents the assertion of otherwise valid rights where one has acted in such a way as to induce another party to detrimentally rely on those actions."). However, even if Anacapa was not estopped from asserting that the breach was incurable, Anacapa's argument would still fail because the court would have found that ADC's breach was curable as a matter of law.

also Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1530 (9th Cir. 1993)(finding that any breach was nonmaterial as a matter of law) rev'd on other grounds, 510 U.S. 517 (1994).

In analyzing whether ADC cured or whether Anacapa can force ADC to forfeit its rights under the contract by terminating the contract, the court recognizes that the law strongly disfavors forfeiture and that the party seeking forfeiture has the burden of proving a right to it. See, e.g., Philadelphia, W. & B.R. Co. v. Howard, 54 U.S. 307, 340 (1852)("The law leans strongly against forfeiture, and it is incumbent on the party who seeks to enforce one, to show plainly his right to it."); S.T. McKnight Co. v. Central Hanover Bank & Trust Co., 120 F.2d 310 (8th Cir. 1941); Naftalin v. John Wood Co., 116 N.W.2d 91, 100 (Minn. 1962). As the Seventh Circuit Court of Appeals stated in Lippo v. Mobil Oil Corp., "if there were two possible constructions [of a contract], only one of which will work forfeiture, the construction may be adopted that will avoid the forfeiture and preserve the rights of the parties." 776 F.2d 706, 715 (7th Cir. 1985). Here, the court concludes that Anacapa may not force ADC to forfeit its rights under the contract by terminating the contract because ADC has cured its material breach through substantial performance or performance without material failure.

**1. ADC required SPC to Treat as Confidential Anacapa's Confidential Information**

In order to cure its breach, ADC took many affirmative steps to require SPC to treat as confidential Anacapa's confidential information. With respect to the Gen 2, ADC obtained an injunction against SPC that ordered SPC to comply with the restrictions contained in the collaboration agreement. Those use restrictions require SPC to use TTT "for ADC's benefit." (Kahnke Aff. Ex. 19 at ¶ 5.1.) While Anacapa argues that the injunction was deficient because it only required SPC to comply with preexisting use restrictions with respect to the Gen 2 product, (Anacapa's Response to ADC's Mot. for Summ. J. at 29), it is undisputed that ADC's agreement with Anacapa allows SPC to use TTT for ADC's benefit. (Kahnke Aff. Ex. 15 at 288-89.)

ADC also required SPC to treat as confidential Anacapa's confidential information by severely restricting SPC in settlement documents.[4] Specifically, through the settlement agreement, ADC prohibited SPC from manufacturing, using, selling, distributing or otherwise disposing of any products incorporating or embodying TTT,

---

[4] Anacapa claims that the cure is ineffective because the settlement agreement provisions relating to ADC's cure terminate on December 1, 2008 while ADC has an obligation to protect Anacapa's confidential information until at least 2013. Anacapa's argument fails because undisputed evidence illustrates that SPC agrees to protect radiator information as long as necessary for ADC to comply with its obligations under the agreement between ADC and Anacapa. (See, e.g., Kahnke Aff. Ex. 25 ¶¶ 2.6, 2.8, 5.2; Ex. 44 at 103-04; Ex. 45 at 3.)

GR or Radiator Information[5] except as expressly set forth in the settlement agreement. (Kahnke Aff. Ex. 25 at ¶ 2.3.) Furthermore, pursuant to addendum 002 (later 003) to the collaboration agreement, ADC required SPC to assign ADC ownership of the Gen 2 patent, which contains Radiator Information. (Kahnke Aff. Ex. 33 ¶ 2.1; Ex. 34.)

### 2. ADC Established Reasonably Adequate Procedures

Paragraph 10.2(b) of the agreement between ADC and Anacapa provides:

---

[5] The settlement agreement defines radiation information as follows:

> "Radiator Information" means information disclosed or made available by ADC or Anacapa to SPC or information developed by SPC using such ADC or Anacapa information in conjunction with the design, development, or manufacture of the Radiator® Repeater Housing, the Radiator® II Repeater Housing, or any components or prototypes thereof, whether or not incorporated or embodied in the Radiator® or Radiator® II repeater housing, including without limitation the information relating to the glove and spring/mast assembly in the Radiator® repeater housing; the glove, top plate, or bottom plate of the Radiator® II repeater housing; or the Thermal Transfer Technology.

(Kahnke Aff. Ex. 25 at ¶ 1.9.)

While Anacapa asserts that ADC did not cure because Radiator Information does not include all Anacapa's confidential information, Anacapa's assertion is based upon a flawed understanding of the "notwithstanding clause" in the agreement, discussed below.

> ADC and the individuals or entities performing services hereunder agree to hold all ANACAPA Confidential Information in confidence and not to disclose the same, without the written consent of ANACAPA, to anyone for any reason at any time other than to ADC's employees, consultants or outside service providers as required for performance of their duties either on ADC's behalf or in connection with ADC's performance for ANACAPA. ADC agrees to maintain reasonably adequate procedures to prevent loss or unauthorized disclosure of any Confidential Information and, in the event of any such loss or unauthorized disclosure, shall notify ANACAPA immediately.

(Kahnke Aff., Ex. 1 at ¶ 10.2(b).) In order to cure its breach of ¶ 10.2(b), ADC implemented reasonably adequate procedures to prevent loss and unauthorized disclosure of Anacapa's confidential information.[6]

ADC secured and exercised audit rights over SPC, allowing ADC to audit SPC's current and future activities to ensure that no current or potential SPC products or components use any Radiator Information. (Kahnke Aff. Ex. 25 ¶ 2.7 and ¶ 2.8; Ex. 23 at 74-75.) ADC also secured control over SPC's future development efforts. SPC has an affirmative obligation to notify ADC of any future development projects relating to certain repeater housing technology, components or processes "so that ADC may confirm that SPC is in fact not using TTT, GR, or Radiator Information or information derived therefrom." (Ex. 33 ¶ 2.6.) Further, ADC has

[6] Many of those steps also assisted ADC in requiring SPC to treat as confidential Anacapa's confidential information.

exercised control over SPC's activities relating to the Gen 2 through the injunction, discussed above, and also monitors SPC through competitive intelligence channels. Additionally, in the settlement agreement between ADC and SPC, ADC required SPC to indemnify ADC for any unauthorized disclosures in order to prevent further loss or disclosure of Anacapa's confidential information. (Ex. 41 ¶ 4.1.)

**3. The "Notwithstanding Clause:" T-Max and Radial Slot 16**

While ADC claims that it cured its breach through substantial performance with respect to all of Anacapa's confidential information, Anacapa argues that ADC did nothing to control SPC's use of Anacapa's confidential information with respect to the T-Max and Radial Slot 16 products. The parties' dispute arises from their disagreement about the meaning of the "notwithstanding clause" in ¶ 10.2(a) of the agreement and thus the scope of the technology that is deemed Anacapa's confidential information.

As part of its definition of Anacapa's confidential information, ¶ 10.2(a) of the agreement provides:

> that the "Confidential Information" shall not include information which:
>
> > (1) Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by ADC, recognizing that the act of copyrighting in itself does not cause the copyrighted material to be in the public domain;

> (2) Is lawfully in the possession of ADC prior to disclosure by ANACAPA as shown by written records; or
>
> (3) Is lawfully disclosed to ADC by a third party which did not acquire the same under an obligation of confidentiality from or through ANACAPA; or
>
> (4) Is independently developed by or on behalf of ADC without reference to Confidential Information received hereunder.
>
> Notwithstanding the above exceptions, any and all Background Thermal Transfer Technology shall also be included within the definition of ANACAPA Confidential Information.

(Kahnke Aff. Ex. 1.)

While the court recognizes that this clause is ambiguous on its face, the undisputed facts illustrate that the "notwithstanding clause" does not include information that was already within the public domain within the definition of Anacapa's confidential information. In his deposition, Erich Laetsche, the sole officer, director and shareholder of Anacapa, acknowledged that ADC does not have an obligation to maintain as confidential BTTT that has been publically disclosed:

> Q: ... [Y]ou're not suggesting that ADC had an obligation to maintain even that Background Thermal Transfer Technology that had been publicly disclosed as a secret?
>
> A: Not as a secret.
>
> Q: They were not somehow required to take it back from the public domain?
>
> A: Correct.

(Kahnke Aff. Ex. 15 at 882-883.)

Likewise, the undisputed facts illustrate that the "notwithstanding clause" does not include information that was independently developed by SPC within the definition of Anacapa's confidential information. Specifically, in an email to ADC in February 2000, Anacapa suggested that if SPC were selling a product using TTT that SPC independently developed, then that the TTT would not be included within the definition of Anacapa's confidential information.[7] (See Kahnke Aff. Ex. 22 at 546-47.) When asked about that email in his deposition, Laetsche acknowledged that if SPC had independently developed the technology, there was "certainly a possibility" that ADC would not have been in breach of its agreement with Anacapa. (Id.)

While the undisputed evidence indicates that the "notwithstanding clause" does not include information that was independently developed or already within the public sphere within the definition of Anacapa's confidential information, Anacapa still

---

[7] In that email, Laetsche wrote:

> We discussed in some detail Thursday, there is a strong possibility that SPC is using Thermal Transfer Technology (TTT) identical to that invented by Anacapa in their products, specifically including the new Adtran housing, probably in violation of the ADC-Anacapa deal. What we do not know for sure is whether SPC got elements of that TTT from ADC or whether they developed it all independently. Hopefully, SPC is using ADC supplied TTT in innocent violation of their ADC-SPC contract.

(Kahnke Aff. Ex. 67; Ex. 22 at 546.)

argues that the "notwithstanding clause" does include such information within the definition of Anacapa's confidential information if such information relates to BTTT. Not only is Anacapa's reading of the "notwithstanding clause" unsupported by the evidence, it also defies common sense. Anacapa cannot reasonably and fairly require ADC to protect information that was already within the public sphere or reasonably and fairly hold ADC liable for SPC's independent development of information before SPC received any of Anacapa's confidential information.

Based upon the court's understanding of the "notwithstanding clause," the T-Max and Radial Slot 16 do not use Anacapa's confidential information. The T-Max does not incorporate Anacapa's confidential information because the T-Max was developed from information SPC produced through independent development efforts undertaken before it met Anacapa.[8] (Kahnke Aff. Ex. 22 at 1080-1081.) Likewise, the Radial Slot 16 does not violate the "notwithstanding clause" because it was independently developed by SPC before SPC received any of Anacapa's confidential information. (Kahnke Aff. Ex 22 1084-86.)

Because Minnesota law disfavors forfeiture, the party seeking to terminate must prove that the breaching party failed to

---

[8] While Anacapa may insinuate that SPC's documentation pertaining to the T-Max was backdated, it offers only speculation to support its insinuation, (Kahnke Aff. Ex. 15 at 720-21), which is not enough to withstand a motion for summary judgment.

effectuate a timely cure by "clear and unmistakable" proof. Larken, Inc. v. Larken Airport Hotel Ltd., No. 95-42299 at 35 (Minn. Dist. Ct. Sept. 12, 1996)(Kahnke Aff. Ex. 40); see also Naftalin, 263 Minn. at 148 ("one claiming forfeiture carries a heavy burden of establishing his right thereto by clear and unmistakable proof."). Anacapa has not met that burden with genuine issues of material facts to withstand summary judgment. Instead, based upon the clear and undisputed facts, the court finds that ADC has cured its breach through substantial performance or performance without material failure.[9]

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that ADC's motion for partial summary judgment (Doc. No. )is granted.

Dated: January 22, 2003

David S. Doty, Judge
United States District Court

[9] While Anacapa claims that ADC did not even attempt to repair the harm done by the breach, (Anacapa's Response to ADC's Mot. for Summ. J. at 28), cure does not so require. Cure only requires ADC to substantially perform its contract obligations. Anacapa can recover damages from ADC to repair past harm. As explained in the Restatement (Second) of Contracts, a material failure may be cured by subsequent performance without a material failure. See Restatement (Second) Contracts § 237, cmt. b. In the event of such a cure, "the injured party may still have a claim for any remaining non-performance as well as for any delay." Id.